10-2131-ag
Pierre v. Holder

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2012

(Argued:  May 31, 2013          Decided:  December 10, 2013)

Docket No. 10-2131-ag

CLERDE PIERRE,

   *Petitioner*,

   v.

ERIC H. HOLDER, JR.,
*United States Attorney General*,

   *Respondent*.

Before:  HALL and LYNCH, *Circuit Judges*, and ENGELMAYER, *District Judge*.[1]

   Clerde Pierre, born in Haiti to unmarried alien parents, petitions for review of an order of

the Board of Immigration Appeals requiring his removal based on the commission of an

aggravated felony, arguing that he had acquired automatic derivative United States citizenship

following the naturalization of his father under former 8 U.S.C. § 1432(a).  We hold that

(1) Pierre was not entitled to automatic citizenship under § 1432(a) because his parents were

never married and thus there could be no "legal separation" as required under the statute; and

(2) denial of citizenship did not unconstitutionally discriminate on the basis of legitimacy or

gender so as to violate equal protection.

---

[1] The Honorable Paul A. Engelmayer, United States District Judge for the Southern District of
New York, sitting by designation.

Petition denied.

MUNEER I. AHMAD, ANNE LAI, Jerome N. Frank Legal
Services Organization, New Haven, CT, *for
Petitioner*.

LANA L. VAHAB (Stuart F. Delery, Jeffrey S. Robins, *on the
brief*), Office of Immigration Litigation, U.S. Dep't
of Justice, Washington, D.C., *for Respondent*.

MATTHEW L. GUADAGNO, New York, NY, VIKRAM
BADRINATH, Tucson, AZ, *for Amicus Curiae
American Immigration Lawyers Association*.

PAUL A. ENGELMAYER, *District Judge*:

Petitioner Clerde Pierre, a citizen of Haiti, seeks review of a final order of the Board of

Immigration Appeals ("BIA") affirming the decision of the Immigration Judge ("IJ") and

rejecting Pierre's claim to automatic derivative citizenship under former 8 U.S.C. § 1432(a). *See

In re Clerde Pierre*, No. A043 682 665 (B.I.A. Apr. 30, 2010), *rev'g* No. A043 682 665 (Immig.

Ct. Hartford Dec. 11, 2009); *In re Clerde Pierre*, No. A043 682 665 (B.I.A. May 13, 2009), *aff'g*

No. A043 682 665 (Immig. Ct. Hartford Feb. 25, 2009).[2]  The removal proceedings at issue were

initiated following a 2006 criminal conviction for sale of a controlled substance and criminal

possession of a weapon.  The BIA found Pierre removable on the bases of these and other

criminal convictions, and determined that Pierre had not acquired derivative United States

citizenship under § 1432(a), which, until its repeal in 2000 in favor of a new statute, prescribed

the conditions under which a child born outside the United States to alien parents automatically

became a United States citizen based on the later naturalization of one or more parents.

---

[2] After Pierre filed his Notice of Appeal before this Court, the BIA issued a final order
dismissing the appeal to permit Pierre to proceed with the present appeal.  *See In re Clerde
Pierre*, No. A043 682 665 (B.I.A. July 22, 2011), *aff'g* No. A043 682 665 (Immig. Ct. Hartford
June 2, 2010).

2

In this appeal, Pierre principally challenges the constitutionality, under the Equal Protection Clause of the Fourteenth Amendment, of § 1432(a)(3). Section 1432(a)(3) defined the circumstances under which such a child would automatically acquire United States citizenship where one of the child's parents naturalized while the other parent was alive. Pierre argues that, as applied by the BIA to deny his claim to automatic derivative citizenship, § 1432(a)(3) unconstitutionally discriminated on the basis of legitimacy and gender, because, he claims, it disfavored children born out of wedlock whose later-naturalizing parent was the father. Pierre asks that we either (1) based on the canon of constitutional avoidance, construe § 1432(a)(3) to have conferred derivative citizenship on persons in his circumstance; or (2) hold § 1432(a)(3) unconstitutional, and as a remedy, extend its award of derivative citizenship to cover him. For the reasons that follow, we reject Pierre's challenge to the statute's constitutionality, and deny the petition for review.

## BACKGROUND

On November 29, 1978, Pierre was born, in Haiti, to Lavaud Pierre ("Lavaud") and Marie Carmel Yverose Thelismé ("Marie"). Lavaud and Marie were not married at the time of Pierre's birth; they never married. Pierre was not raised by his mother, who abandoned him at a young age.

In 1981, Lavaud moved to the United States, leaving Pierre in the care of his great grandmother, who cared for him until the age of six, when he was sent to live with members of Lavaud's extended family. In 1992, Lavaud became a naturalized citizen. In 1993, while still a minor, Pierre came to the United States as a lawful permanent resident to live with his father. Since then, Pierre has lived in Connecticut with his father, except during times when Pierre has been incarcerated.

3

In 1994, Lavaud applied for citizenship on behalf of Pierre pursuant to 8 U.S.C. § 1433. Upon the application by a citizen parent of a child born outside the United States who has not automatically acquired citizenship, § 1433 requires the Attorney General to issue a certificate of citizenship to the parent, provided that designated conditions have been fulfilled. As part of this application, Lavaud submitted an affidavit from Marie, in which she formally disclaimed all parental rights. Lavaud's § 1433 application on Pierre's behalf, however, was, apparently, never decided. The record in this case does not disclose why.[3]

In 2001, Pierre was convicted of two counts of robbery in the third degree. He was imprisoned for two years and served three years of probation.

On July 7, 2006, after his term of probation had been served, Pierre was convicted of the sale of a controlled substance and criminal possession of a weapon.

On May 15, 2008, after Pierre served his prison sentence for those convictions, the Government initiated removal proceedings. On September 25, 2008, an initial removal hearing was held.

In opposing his removal during these administrative proceedings, Pierre argued below that he cannot be removed, on two grounds: first, that he is an American citizen, having acquired automatic derivative citizenship pursuant to former 8 U.S.C. § 1432(a)(3); and, second, that if returned to Haiti he would be subject to torture, and he is therefore protected under the Convention Against Torture ("CAT"). On February 25, 2009, the IJ issued a decision denying

---

[3] While this appeal was pending, Pierre submitted various materials relating to Lavaud's 1994 application; these are outside the administrative record. Over the Government's objection, the Court received these materials, with the proviso that the "panel addressing the merits of this case will consider the significance of the documents." We have considered these materials in order to understand the application that was made by Lavaud on Pierre's behalf, but because these materials do not reveal why no final determination on Lavaud's application was made, they do not affect the resolution of Pierre's current petition. *See* note 10 *infra*.

4

Pierre's application for asylum and withholding of removal under CAT without mentioning his claim for derivative citizenship. By order dated May 13, 2009, the BIA affirmed the IJ's denial of CAT relief and held that Pierre was not entitled to automatic United States citizenship under § 1432(a)(3), finding that Pierre had not become a citizen under that statute.

On May 20, 2009, Pierre timely filed a petition for review with this Court. However, before the Court considered the petition, on August 11, 2009, Pierre filed a motion to reopen with the BIA, asking it to reconsider its CAT decision in light of new evidence that Pierre suffers from paranoid-type schizophrenia. On September 15, 2009, the BIA granted the motion to reopen and remanded to the IJ.

The IJ again denied the CAT claim. On April 30, 2010, the BIA reversed the denial of CAT relief, finding it more likely than not that Pierre would be tortured in Haiti because he suffers from mental illness. The case was remanded and the IJ granted a deferral of removal to Haiti under CAT.

On May 26, 2010, Pierre filed the current petition for review of the BIA's April 30, 2010 decision. The petition challenged only the BIA's May 13, 2009 finding as to Pierre's citizenship under 8 U.S.C. § 1432(a).

## DISCUSSION

This appeal raises questions about the construction, and the constitutionality, of former 8 U.S.C. § 1432(a). As of 1993, when Pierre became a lawful permanent resident, § 1432(a) read in full:

> A child born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:
> (1) The naturalization of both parents; *or*

5

(2) The naturalization of the surviving parent if one of the parents is deceased; *or*

(3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents *or* the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; *and if*

(4) Such naturalization takes place while such child is under the age of eighteen years; *and*

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (emphases added).[4]

Thus, for a child to have qualified for automatic citizenship under § 1432(a), the conditions listed in *one* of the first three subsections must have been fulfilled, and *both* the conditions listed in the last two subsections must have been fulfilled, *i.e.*, the naturalization must have taken place while the child was under the age of 18, *id.* § 1432(a)(4); and the child must have been lawfully residing in the United States at the time of naturalization or have begun

---

[4] In 2000, § 1432(a) was repealed and replaced by a different provision governing automatic derivative citizenship, the Children Citizenship Act (CCA) of 2000, Pub. L. No. 106-395, §§ 101, 103, 114 Stat. 1631, 1631–33 (2000). In addition to repealing § 1432, the CCA amended §§ 1431 and 1433. Section 1431(a) now supplies the relevant framework for automatic derivative citizenship. It provides:

> A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled:
> (1) At least one parent of the child is a citizen of the United States, whether by birth or naturalization.
> (2) The child is under the age of eighteen years.
> (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence.

8 U.S.C. § 1431(a). Under the statutory framework supplied by the CCA, a child in Pierre's circumstances as they stood in 1993 would be entitled to derivative citizenship. But "the CCA does not confer citizenship retrospectively." *Drakes v. Ashcroft*, 323 F.3d 189, 191 (2d Cir. 2003); *see id.* ("The CCA's derivative citizenship provision applies only to children who, *as of the effective date of the CCA*, [meet § 1431(a)'s requirements]." (emphasis in original)).

residing in the United States before the age of 18, *id.* § 1432(a)(5). The parties agree that, as of 1993, Pierre had satisfied §§ 1432(a)(4) and (5), and that §§ 1432(a)(1) and (2) did not apply. Pierre's claim to automatic derivative citizenship therefore turns on § 1432(a)(3).

The BIA held that the text of § 1432(a)(3) foreclosed Pierre's bid. The first of the two disjunctive clauses in § 1432(a)(3), *i.e.*, the one conferring automatic citizenship in the case of "[t]he naturalization of the parent having legal custody of the child when there has been a legal separation of the parents," did not apply to Pierre: The BIA noted that although Lavaud, Pierre's custodial parent, was naturalized, Lavaud was never married to Marie; therefore, there was never a "legal separation" of Pierre's parents. And the second clause in § 1432(a)(3), which applies by its terms to a "child born out of wedlock," could not, by its terms, assist Pierre: it was satisfied only where the mother naturalized, but it was Pierre's father, rather than his mother, who naturalized.

In this appeal, Pierre argues that § 1432(a)(3), as thus read, was unconstitutional, for two independent reasons. First, he argues, § 1432(a)(3) discriminated based on legitimacy. Pierre notes that, although § 1432(a)(3) awarded automatic citizenship to children of once-married but now legally separated parents upon the naturalization of the custodial parent, it did not (save in the circumstance where paternity had not been established) contain a comparable provision awarding such citizenship to children, like him, of unmarried parents whose custodial parent naturalized. Second, he argues, § 1432(a)(3)'s second clause discriminated based on gender— the gender of the naturalizing parent. Pierre notes that, although § 1432(a)(3) awarded automatic citizenship to children born out of wedlock where the custodial mother had been naturalized, it did not afford any avenue for automatic citizenship of out-of-wedlock children, like him, where

7

it was the custodial father who had naturalized.  Pierre argues that both types of discrimination are subject to, and fail, intermediate scrutiny.

To avoid having to invalidate the statute as unconstitutional, Pierre urges us to apply the canon of constitutional avoidance, and construe either the first or the second clause of § 1432(a)(3) so as to have afforded him automatic derivative citizenship.  Alternatively, he argues that we should hold § 1432(a)(3) unconstitutional, and, as a remedy, extend its coverage to reach him.

The Government, for its part, counters that the constitutional avoidance canon does not apply because § 1432(a)(3) was unambiguous; that § 1432(a)(3) satisfied the Equal Protection Clause, whether evaluated under rational basis review (as the Government urges) or intermediate scrutiny; and that even if § 1432(a)(3) were unconstitutional, a court may not, as a remedy, extend its coverage.  The Government also argues that, to the extent Pierre challenges § 1432(a)(3) as an improper gender classification, Pierre lacks standing to do so.

### A.  Jurisdiction

We first consider our jurisdiction.  We have reviewed both the IJ's and the BIA's opinions "'for the sake of completeness.'"  *Zaman v. Mukasey*, 514 F.3d 233, 237 (2d Cir. 2008) (per curiam) (quoting *Wangchuck v. DHS*, 448 F.3d 524, 528 (2d Cir. 2006)).  Although in general we lack jurisdiction to review final orders of removal of aliens, like Pierre, who are removable due to aggravated felony or controlled substance offense convictions, *see* 8 U.S.C. § 1252(a)(2), we retain jurisdiction to review constitutional claims and questions of law, 8 U.S.C. § 1252(a)(2)(D).  *See Vargas-Sarmiento v. U.S. Dep't of Justice*, 448 F.3d 159, 164 (2d Cir. 2006).  We also "retain jurisdiction to review [petitioner's] claim 'that he is a citizen and

therefore not removable' at all." *Lewis v. Gonzales*, 481 F.3d 125, 128 (2d Cir. 2007) (per curiam) (quoting *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir. 2004)).

Even when a petition raises a constitutional claim, a question of law, or a question of citizenship, however, our jurisdiction is limited to review of "final order[s] of removal." 8 U.S.C. § 1252(a)(1); *see also Chupina v. Holder*, 570 F.3d 99, 103 (2d Cir. 2009). The BIA's order in this case does not on its face appear to be an order of removal, as the BIA *reversed* the IJ's order that Pierre be removed, and instead granted him deferral of removal under CAT. The order nevertheless qualifies as an order of removal that Pierre may appeal.

Our cases make clear that an agency order may qualify as an order of removal where it establishes the alien's removability, even if it does not order that the alien be immediately removed. *See, e.g.*, *Lazo v. Gonzales*, 462 F.3d 53, 54 (2d Cir. 2006). We have explained that an "order of removal" is synonymous with an "order of deportation," which the INA defines in the disjunctive as "the order of the special inquiry officer . . . *concluding that the alien is deportable* or ordering deportation." *Id.* (internal quotation marks omitted) (emphasis added); *see also* 8 U.S.C. § 1101(a)(47)(A); *Lolong v. Gonzales*, 484 F.3d 1173, 1177 & n.2 (9th Cir. 2007) (explaining that an IJ's determination that "alien is deportable . . . constitutes an order of deportation" (internal quotation marks omitted)). Thus, an IJ's determination that an alien is removable constitutes an order of removal, even if relief from removal is granted. In this case, the IJ found that Pierre was removable to Haiti and denied Pierre's application for various forms of relief from removal, including relief under CAT. The BIA ultimately affirmed the IJ's determination of Pierre's removability, but reversed the IJ's denial of relief under CAT. The BIA's reversal of the IJ's denial of relief under CAT did not displace, but rather confirmed, the IJ's determination of Pierre's removability. *Cf. Chupina*, 570 F.3d at 104−05 (explaining that

9

IJ's finding of alien's removability is a necessary antecedent to grant of protection under CAT). In practical terms, deferral of removal under CAT offers Pierre only limited protection from removal, lasting only until such time, if any, as the threat of torture is removed; the denial of Pierre's claim of citizenship, however, which if accepted would permanently protect him from removal, reaffirms his removability, and thus constitutes an order of removal that we may review.

We therefore conclude that we have jurisdiction over Pierre's petition for review, and may review Pierre's equal protection challenge to the derivative citizenship statute under 8 U.S.C. § 1432. *See Poole v. Mukasey*, 522 F.3d 259, 264 (2d Cir. 2008). We review such constitutional challenges *de novo*. *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 89 (2d Cir. 2010); *Gjerjaj v. Holder*, 691 F.3d 288, 292 (2d Cir. 2012).

## B. Pierre's Challenge to § 1432(a)(3)'s Asserted Legitimacy Classification

### 1. Standing

Pierre undisputedly has standing to challenge the classification in § 1432(a)(3) that he describes as one based on legitimacy. To have standing, a plaintiff must have suffered (1) "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Pierre meets that standard: He claims an injury (denial of automatic derivative citizenship) traceable to a classification within § 1432(a)(3) (the differential treatment of children of married couples and other children) that disfavors him and that is redressable by a favorable decision (construing or extending the statute to reach him).

10

## 2. *Constitutional Avoidance*

We consider first Pierre's argument based on the constitutional avoidance canon. Pierre argues that we should construe § 1432(a)(3)'s first clause—which made automatic citizenship available upon "[t]he naturalization of the parent having legal custody of the child when there has been a legal separation of the parents"—to have applied to children not only of married parents who have been separated, but also to children of out-of-wedlock parents where one parent has renounced parental rights. That construction, he argues, would avoid serious constitutional problems under the Equal Protection Clause.[5]

Under the canon of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems," a court should "construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The canon, however, is not "a method of adjudicating constitutional questions by other means." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). It is instead a "tool for choosing between *competing* plausible interpretations of a statutory text." *Id.* (emphasis added); *see also United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) (rule of constitutional avoidance is "relevant to our resolution of any textual ambiguity"). The canon thus "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001); *accord Magassouba*, 544 F.3d at 404.

The constitutional avoidance canon does not apply here. Pierre's premise is that it is ambiguous whether the statutory term "legal separation" applies to his parents' situation, and thus the canon should apply. But that term is not ambiguous in this context. Quite to the

---

[5] In his case, Pierre urges, this standard would be met by Marie's 1994 affidavit formally disclaiming parental rights.

11

contrary, in a line of cases, this Court has consistently construed the term "legal separation" to apply only to marital relationships.

In *Brissett v. Ashcroft*, 363 F.3d 130 (2d Cir. 2004), for example, we held that the term "legal separation" in § 1432(a)(3) "requires a formal act which, under the laws of the state or nation having jurisdiction of the marriage, alters the marital relationship either by terminating the marriage (as by divorce), or by mandating or recognizing the separate existence of the marital parties." 363 F.3d at 134 (Sotomayor, J.). Accordingly, we held that "an informal separation is not sufficient to render the parties legally separated." *Id.* at 133 (footnote omitted). Applying that standard, we held that a married couple's *de facto* separation did not satisfy that standard, even though coupled with a child support order and two orders of protection against the father. *Id.*

In *Lewis v. Gonzales*, 481 F.3d 125 (2d Cir. 2007) (per curiam), we revisited the same provision. We applied it, this time, to a situation quite similar to Pierre's: Lewis, the child of alien parents who had never married, lived from age 13 in the custody of his naturalized father in the United States. We stated that the "plain language" of the statute was unambiguous, and that Lewis's parents were required "to have achieved a 'legal separation' before Lewis could receive automatic derivative citizenship through his father or, for that matter, his mother." 481 F.3d at 131. The establishment of legal custody over a child, we held, is not tantamount to legal separation of the parents. *Id.* at 130. "The fact that Lewis's mother [had] agreed to transfer Lewis to his father establishes legal custody, but not legal *separation*." *Id.* (citing *Brissett*, 363 F.3d at 134). And the fact that Lewis's parents had never married, and therefore did not have a marriage to formally dissolve, "does not alter our analysis." *Id.*

12

We have consistently adhered to this construction of the statutory term "legal separation," both in cases in which the petitioner's parents were married and in which they were not.[6] Other courts have likewise held that the parents' marriage is a prerequisite for the first clause of § 1432(a)(3) to apply. *See, e.g.*, *Morgan v. Att'y Gen. of the U.S.*, 432 F.3d 226, 234 (3d Cir. 2005); *Johnson v. Whitehead*, 647 F.3d 120, 125 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 1005 (2012); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003); *Nehme v. INS*, 252 F.3d 415, 425–26 (5th Cir. 2001). Petitioner does not cite, nor can we find, cases to the contrary.

As these decisions reflect, the term "legal separation," read naturally, referred to the formal state of the relationship between marital partners. This term did not readily apply to unmarried parents.[7] And, contrary to Pierre's alternative argument here, it did not describe, and cannot reasonably be read to have described, the arrangement or legal relationship between a parent and his or her child. *See, e.g.*, *Garcia v. USICE (Dep't of Homeland Sec.)*, 669 F.3d 91, 96 (2d Cir. 2011) ("Divorce and judicial separation are inherently different from custody

---

[6] *See, e.g.*, *Holguin v. Holder*, 420 F. App'x 31, 33 (2d Cir. 2011) (denying claim to derivative citizenship under § 1432(a)(3), where married parents "undertook no "formal act that altered their marital relationship"); *Henry v. Quarantillo*, 414 F. App'x 363, 365 (2d Cir. 2011) (denying claim to derivative citizenship under § 1432(a)(3) because alien's unmarried parents had no "formal act" of separation); *Hamilton v. Mukasey*, 256 F. App'x 396, 398 (2d Cir. 2007) (denying claim to derivative citizenship by alien who arrived in United States at age 11 to live with his naturalized father because "Hamilton's parents were never married and therefore never legally separated, as required under § 1432(a)(3)"); *Duncan-Lopez v. Gonzales*, 208 F. App'x 30, 32 (2d Cir. 2006) (denying claim to derivative citizenship under § 1432(a)(3) where alien, born out of wedlock, could not identify "formal act . . . alter[ing] the marital relationship").

[7] In *Lewis*, we "h[e]ld open the possibility, however remote, that some jurisdiction might allow unwed couples to achieve a legal separation." 481 F.3d at 130 (citing *Wedderburn v. I.N.S.*, 215 F.3d 795, 799 (7th Cir. 2000) ("Because the INS determines the existence, validity, and dissolution of wedlock using the legal rules of the place where the marriage was performed (or dissolved), it is at least possible that Jamaica permits unmarried persons to obtain a 'legal separation' and an award of 'legal custody' of the children.") (internal citation omitted)). Today's decision also leaves open that possibility. However, Pierre has not argued, let alone alleged that there is evidence, that his parents' relationship with each other was ever altered in any formal way under Haitian law so as to achieve a legal separation.

decisions."); *Morgan*, 432 F.3d at 234 (recognizing that, in contrast to "legal custody," "legal separation" requires a "formal governmental action"); *see also Ayton v. Holder*, 686 F.3d 331, 337 (5th Cir. 2012) (holding that the child's "guardianship did not create and was not equivalent to legal separation"). It is, therefore, not ambiguous whether the term "legal separation" in § 1432(a)(3) was satisfied by one parent's disclaimer of parental rights. Pierre's attempt to expand that term to cover situations in which a non-married parent had repudiated parental rights would not clarify statutory ambiguity. Instead, it would substantively broaden the statute. We therefore reject Pierre's argument that, based on the canon of constitutional avoidance, § 1432(a)(3)'s first clause should be read to cover him.

### 3. *Equal Protection*

We turn, then, to Pierre's constitutional claim—that § 1432(a)(3) discriminated on the basis of legitimacy, so as to violate the Equal Protection Clause.

Classifications based on legitimacy, like those based on gender, ordinarily are subject to intermediate scrutiny. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Craig v. Boren*, 429 U.S. 190, 197 (1976). There is, however, an exception. Where legitimacy classifications arise in an immigration statute, the Supreme Court has held that less searching judicial scrutiny is in order. In *Fiallo v. Bell*, 430 U.S. 787 (1977), the Court required only a "'facially legitimate and bona fide reason'" for the adoption of an immigration statute that excluded illegitimate children of unwed fathers from eligibility for special immigration preference visas. *Id.* at 794 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 767 (1972)); *see Fiallo*, 430 U.S. at 794–796 (explaining the reasons for "special judicial deference to congressional policy choices in the immigration context"). The *Fiallo* standard, we have stated, equates to rational basis review. *See Azizi v. Thornburgh*, 908 F.2d 1130, 1133 n.2 (2d Cir. 1990).

14

Attempting to distinguish the *Fiallo* line of authority, Pierre notes that § 1432(a) is a *naturalization* rather than an *immigration* statute. He argues that, although policy considerations may justify rational basis review in the context of immigration statutes, they do not do so in the context of naturalization statutes, "because the questions presented do not implicate Congress's power to control access to the boundaries of the United States or the nation's physical integrity."

The Supreme Court has not resolved this question. In *Miller v. Albright*, 523 U.S. 420 (1998), a Court plurality declined to apply *Fiallo*'s "facially legitimate and bona fide reason" standard to a naturalization statute. *See id.* at 429 ("[W]e need not decide whether *Fiallo v. Bell* dictates the outcome of this case, because that case involved the claims of several aliens to a special immigration preference, whereas here petitioner claims that she is, and for years has been, an American citizen."). Our sister circuits have reached different conclusions on this point. Some have applied, or stated that they would apply, the relaxed *Fiallo* standard to classifications drawn in naturalization statutes. *See, e.g.*, *Johnson v. Whitehead*, 647 F.3d 120, 127 (4th Cir. 2011) ("[I]n matters of immigration *and naturalization*, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" (quoting *Fiallo*, 430 U.S. at 792) (emphasis added)); *Wedderburn v. I.N.S.*, 215 F.3d 795, 800 (7th Cir. 2000) (appearing to apply rational basis review to § 1432(a)). Others have indicated or assumed that, in the context of a naturalization statute, heightened scrutiny may still apply to classifications that ordinarily would merit such scrutiny. *See, e.g.*, *Barthelemy*, 329 F.3d at 1068 ("We assume without deciding that Barthelemy would be entitled to the heightened standard of scrutiny applicable to gender-based discrimination with respect to this challenge to [§ 1432(a)], were it discriminatory on the basis of sex."); *Ayton v. Holder*, 686 F.3d 331, 338–39 (5th Cir. 2012) (applying heightened scrutiny to gender discrimination claim regarding § 1432(a)); *Marquez-Morales v. Holder*, 377 F. App'x

15

361, 365 (5th Cir. 2010) ("Challenges to INA classifications are typically subject to rational basis review, but gender based classifications receive review under a heightened standard."); *cf. Catwell v. Att'y Gen. of the U.S.*, 623 F.3d 199, 211 (3d Cir. 2010) (appearing to apply heightened scrutiny in reviewing challenge to § 1432(a)).

We, like the Supreme Court in *Miller*, have no occasion to resolve this doctrinal question, because § 1432(a) does not discriminate on the basis of a protected class. We are persuaded that § 1432(a), although referring in one subsection, (a)(3), to children born out of wedlock, did not classify based on legitimacy. That is because, viewing § 1432(a) as a whole, the marital status of a child's parents at the time of birth did not determine the child's eligibility for automatic citizenship. A child born out of wedlock was as eligible as a child born to married parents to obtain automatic derivative citizenship based on the naturalization of both parents, *see* 8 U.S.C. § 1432(a)(1), or the naturalization of the sole surviving parent, *see id.* § 1432(a)(2). And, fairly read, § 1432(a)(3) does not impose extra burdens on children born out of wedlock. Instead, it attempts to address, in a pragmatic fashion, two inherently different contexts in which a child with a living non-citizen parent might acquire citizenship: one involving children with once-married parents, and the other involving children out of wedlock and whose paternity therefore might be unknown.

Viewed in this light, the distinction drawn in § 1432(a)(3) did not reflect discrimination based on legitimacy. The text of § 1432(a)(3) instead reflected an evident policy judgment that, where two parents survived but only one had naturalized, respect was due for the interests of the alien parent, lest those interests be usurped by the naturalization of the other parent. *See Lewis*, 481 F.3d at 131 ("[N]aturalization is a significant legal event with consequences for the child here and perhaps within his country of birth or other citizenship. . . . The statute recognizes that

16

either parent— naturalized or alien—may have reasons to oppose naturalization of their child, and it respects each parent's rights in this regard."); *see also Brissett*, 363 F.3d at 134; *Barthelemy*, 329 F.3d at 1066. Accordingly, rather than automatically award a child derivative citizenship based on one parent's naturalization, § 1432(a)(3) was drafted with attention to context. It awarded automatic derivative citizenship only in those discrete contexts in which it was fair to treat the child's relationship with the naturalizing parent as taking precedence over the child's relationship with the alien parent. So, where the parents had been married, the statute automatically made the child an American citizen only where the parents had legally separated and where the naturalizing parent was the custodial parent. And, where the parents had not married, § 1432(a)(3) awarded derivative citizenship to the child only where, because paternity had not been established, the naturalizing mother was the only recognized parent, and thus there was not be an identifiable alien father whose interests stood to be harmed by making the child an American citizen. Notably, outside those specific contexts, § 1432(a)(3) did not award automatic derivative citizenship to the child, out of evident solicitude for the interests of the alien parent. This was so regardless of the marital status of the child's parents at the moment of birth.

Moreover, even if—contrary to our conclusion above—§ 1432(a)(3) were viewed as containing such a classification, it would satisfy intermediate scrutiny. *See Tuan Anh Nguyen v. I.N.S.* (*Nguyen*), 533 U.S. 53, 61 (2001) (upholding naturalization statute against equal protection challenge; because statute satisfied intermediate scrutiny, Court did "not decide whether some lesser degree of scrutiny pertains because the statute implicates Congress' immigration and naturalization power"). "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Clark*, 486 U.S. 456 at 461. The government interest "must be genuine, not hypothesized or invented *post hoc* in response to

17

litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996*); accord Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675 (2013).

Here, the Government argues, former § 1432(a) advanced two closely related interests: the preservation of the family unit and protection of the parental rights of the alien parent. The legislative history of the statute, although sparse, recites the former interest. *See Nehme*, 252 F.3d at 424; *see also* H.R. Rep. No. 1365, at 29 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680 ("[The INA] implements the underlying intention of our immigration laws regarding the preservation of the family unit."); S. Rep. No. 82-1137, at 16 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1105, 1120 (characterizing the INA as "consistent with the well-established policy of maintaining the family unit wherever possible"). And our decisions have consistently recognized the second interest as animating § 1432(a) as a whole. As we have explained: "The governing principle [of § 1432(a)] . . . is respect for the rights of an alien parent who may not wish his child to become a U.S. citizen." *Lewis*, 481 F.3d at 130.

Other courts of appeals have similarly recognized that Congress, in enacting § 1432(a), intended to assure, both as to children of married parents and children out of wedlock, that the interests of a known alien parent not invariably be trumped by those of the naturalizing parent. As the Fifth Circuit explained, albeit in applying rational basis review, Congress "could have rationally concluded that requiring the naturalization of both parents of the alien child, when the parents remain married, was necessary to promote marital and family harmony and to prevent the child from being separated from an alien parent who has a legal right to custody." *Nehme*, 252 F.3d at 425; *see also id.* ("This history indicates that Congress wanted to ensure that only those alien children whose 'real interests' were located in America with their custodial parent, and not abroad, should be automatically naturalized."); *Barthelemy*, 329 F.3d at 1066 ("If United States

18

citizenship were conferred to a child where one parent naturalized, but the other parent remained an alien, the alien's parental rights could be effectively extinguished"; "[t]he legal separation requirement helps protect the parental rights of the alien parent, and is therefore consistent with the statutory scheme" to "protect[] parental rights"); *Catwell*, 623 F.3d at 211 (finding congressional intent to "allow[] single parent derivative citizenship while protecting the rights of alien parents by limiting circumstances in which it (derivative citizenship) can occur"); *Johnson*, 647 F.3d at 126–27; *Ayton*, 686 F.3d at 338–39; *Wedderburn*, 215 F.3d at 800. In its overall purpose and effect, then, § 1432(a) prevented the naturalizing parent from depriving the alien parent of parental rights, absent a legal custodial arrangement favoring the naturalizing parent.

We agree that these are important government interests. In the intermediate scrutiny analysis, then, our examination turns to whether the differing standards in § 1432(a)(3) with respect to children of legally separated parents and children out of wedlock substantially advanced these stated interests. "Although the government need not produce evidence to a scientific certainty of a substantial relationship, it carries the burden of proving such a relationship." *Ramos v. Town of Vernon*, 353 F.3d 171, 183 (2d Cir. 2003) (citation omitted). "The purpose of requiring [proof of] that close relationship is to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724–25 (1982).

That standard was met by § 1432(a)(3). As noted, each clause in that subsection was addressed to a particular familial context, and each served to respect the alien parent's legitimate rights in that context. Thus, the first clause, addressed to the situation presented by married parents, permitted one parent's naturalization to trump the alien parent's rights, and to confer

19

automatic citizenship on their child, only where the couple was legally separated and the naturalizing parent had legal custody. Similarly, the second clause, involving never-married parents, permitted one parent's naturalization (the mother's) to trump the alien parent's rights, and to confer citizenship on the child, only where paternity was not established. In limiting automatic naturalization only to such narrow situations in which it was reasonable to infer that the alien parent had a lesser interest in the child's citizenship, these clauses were substantially related to, and served to vindicate, the governmental interest in respecting the rights of the alien parent.

Pierre faults § 1432(a)(3) for not establishing a mechanism by which an out-of-wedlock child whose paternity had been established, but whose unmarried parents lived apart, could obtain automatic citizenship upon the custodial parent's naturalization. He argues that Congress could have made such citizenship available to an out-of-wedlock child where the child's unmarried parents had since undertaken some unspecified "formal legal act" to mark their separation. But we agree with the Government that that proposed standard is amorphous and unworkable. There is no legal event that marks the separation of an unmarried couple, and Pierre's proposal would not supply a credible bright-line standard akin to the legal separation standard for a married couple.

To be sure, Congress, had it been alert to the problem presented by children in Pierre's situation, could have crafted a different statute, one responsive to that situation. As the Court of Appeals for the Ninth Circuit explained in upholding § 1432(a) in the factually similar case of *Barthelemy v. Ashcroft*: "The statute may not be perfect. Perhaps Congress should have carved out an additional route to citizenship for petitioners such as Barthelemy whose fathers have naturalized and have custody over their children but never married the natural mother of their

20

children." 329 F.3d at 1067. And indeed, the Children Citizenship Act of 2000, Pub. L. No. 106-395, §§ 101, 103, 114 Stat. 1631, 1631–33 (2000), the statute that succeeded § 1432(a), today provides for automatic citizenship for all children residing in the United States in the legal and physical custody of a citizen parent pursuant to a lawful admission for permanent residence. *See supra*, p. 6 n.3. But the Equal Protection Clause did not obligate Congress to so legislate; that Congress either did not spot, or spotted but did not act to close, this hole in the statutory framework did not make § 1432(a)(3) unconstitutional. *See Nguyen*, 533 U.S. at 70 (under intermediate scrutiny, statute need not "be capable of achieving its ultimate objective in every instance"); *see also Catwell*, 623 F.3d at 211; *Barthelemy*, 329 F.3d at 1067; *Wedderburn*, 215 F.3d at 800.

Two additional points reinforce our conclusion that this statutory arrangement did not violate the equal protection rights of out-of-wedlock children such as Pierre. First, even if viewed as a legitimacy classification, and again we do not think it can fairly be so viewed, § 1432(a)(3) was not legitimacy discrimination in its classic sense. The Supreme Court has articulated the reasoning behind applying heightened scrutiny to classifications based on legitimacy: "We have applied an intermediate level of scrutiny to laws 'burden[ing] illegitimate children for the sake of punishing the illicit relations of their parents, because visiting this condemnation on the head of an infant is illogical and unjust.'" *Astrue v. Capato ex rel. B.N.C.*, 132 S. Ct. 2021, 2033 (2012) (quoting *Clark*, 486 U.S. at 461) (alteration in original).[8] But

---

[8] *See, e.g.*, *Clark*, 486 U.S. at 465 (overturning under heightened scrutiny state statute requiring illegitimate children to prove paternity within six years of birth in order ever to seek financial support from father); *Pickett v. Brown*, 462 U.S. 1, 18 (1983) (applying heightened scrutiny to two-year period for establishing paternity and finding that it unduly restricted the right of illegitimate children to parental support); *Mills v. Habluetzel*, 456 U.S. 91, 99–101 (1982) (applying heightened scrutiny to one-year period for establishing paternity and finding that it failed to provide illegitimate children with an adequate opportunity to obtain parental support);

21

§ 1432(a) did not deliberately target illegitimate children for disfavored treatment or impose burdens based on stigma or stereotyping. Rather, in § 1432(a)(3) any such classification was incidental, made in an effort to set workable, bright-line standards applicable to the different contexts presented by married, and never-married, parents.

Second, it is important to take a broader view of the legal framework available as of 1993 to naturalizing parents who wished to obtain citizenship for their children. It is true that no part of § 1432(a)(3) gave Pierre a route to automatic citizenship; there was no act his father, Lavaud, could have taken (short of marrying and then legally separating from Pierre's mother) that would have resulted in Pierre's automatically becoming an American citizen. But § 1432(a)(3) cannot be assessed out of context. "It is axiomatic 'that a section of a statute should not be read in isolation from the context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, we are not guided by a single sentence or member of the sentence but (rather) look to the provisions of the whole law, and to its object and policy.'" *Langhorne v. Ashcroft*, 377 F.3d 175, 180 (2d Cir. 2004) (quoting *Richards v. United States*, 369 U.S. 1, 11 (1962)). Here, the statutory scheme, taken as a whole, provided an alternate route to naturalization for persons in Pierre's precise circumstances—specifically, naturalization under 8 U.S.C. § 1433. *See Wedderburn*, 215 F.3d at 800 ("unsound" to read § 1432 without considering § 1433).

At the relevant time period, § 1433 provided that

> [a] parent who is a citizen of the United States may apply to the Attorney General for a certificate of citizenship on behalf of a child born outside the United States. The Attorney General shall issue such a certificate of citizenship upon proof to the satisfaction of the Attorney General that the following conditions have been fulfilled:

---

*Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175–76 (1972) (holding that denial of workmen's compensation laws benefits upon death of father to dependent unacknowledged, illegitimate children violated equal protection).

22

(1) At least one parent is a citizen of the United States, whether by birth or naturalization.

(2) The child is physically present in the United States pursuant to a lawful admission.

(3) The child is under the age of 18 years and in the legal custody of the citizen parent.

(4) If the citizen parent is an adoptive parent of the child, the child was adopted by the citizen parent before the child reached the age of 16 years and the child meets the requirements for being a child under subparagraph (E) or (F) of section 1101(b)(1) of this title.

(5) If the citizen parent has not been physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years--

> (A) the child is residing permanently in the United States with the citizen parent, pursuant to a lawful admission for permanent residence, or
>
> (B) a citizen parent of the citizen parent has been physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years.

8 U.S.C. § 1433(a).

In 1994, when Lavaud applied for Pierre's naturalization, it is undisputed that Pierre met these standards.[9] And § 1433 did not confer discretion upon the Attorney General to deny an application on behalf of a child who met its requirements: Rather, it stated that the Attorney General "shall" issue a certificate of citizenship to such a child. *Id.* Lavaud therefore had the opportunity to seek and obtain American citizenship for Pierre through a readily available mechanism that imposed only "modest requirements" on him.[10] *Lewis*, 481 F.3d at 132.

---

[9] We assume *arguendo*, as do the parties on this appeal, that Pierre had been legitimated, and thus met the definition of "child" under 8 U.S.C. § 1101(c)(1). There is, in fact, a factual dispute over whether Pierre was properly legitimated in 1994. In its brief opposing Pierre's motion for judicial notice and transfer to the district court, the Government argues that Pierre was never legitimated under either Connecticut or Haitian law, and so was not eligible for naturalization under § 1433 in 1994. However, because all parties assume Pierre has been legitimated for the purpose of this appeal, the Court has no occasion to address this issue.

[10] We acknowledge that our reference to the alternative route to citizenship provided by § 1433 may appear coldly ironic to Pierre, given that his father unsuccessfully sought to avail himself of

23

Viewing the statutory scheme as a whole, there was, therefore, no "crack in our immigration law" that denied citizenship on the basis of membership in a protected class. *Id.* While this option may be foreclosed to Pierre today, as in *Nguyen*, the bar is due to an exogenous factor—here, adult age—"not to an equal protection denial or to any supposed rigidity or harshness in the citizenship laws," 533 U.S. at 71.

We therefore reject Pierre's challenge to § 1432(a)(3) as an unconstitutional legitimacy classification.

### C. Pierre's Challenge to § 1432(a)(3)'s Gender Classification

Pierre alternatively argues that the second clause in § 1432(a)(3) improperly classified on the basis of gender, in that, under some circumstances, it permitted an out-of-wedlock child of a

---

this remedy in 1994. Despite the mandatory nature of § 1433, and Pierre's apparently undisputed eligibility under that statute in 1994, the certificate never issued, for reasons not disclosed by the present record. The unfortunate apparent failure of this remedy in Pierre's case, however, does not undermine the point made in the text: the availability of § 1433 in the larger statutory scheme makes clear that Congress did not intend to bar children in Pierre's situation from citizenship on the basis of illegitimacy.

In view of the unexplained failure of the agency to act on Lavaud's § 1433 application, Pierre asks us, if we reject his attack on the constitutionality of § 1432(a)(3), to rule in his favor on an alternative ground, by granting that application *nunc pro tunc*. The Government counters that the application may not be granted today because Pierre is, *inter alia*, an adult and a convicted felon. The issue is not properly before us. This is an appeal from the BIA's denial of Pierre's claim to derivative citizenship based on the alleged unconstitutionality of the provisions of § 1432(a)(3) that render him ineligible for citizenship under that section. Pierre did not make any claim under § 1433 before the BIA; the documents relevant to Lavaud's application under that statute were never presented to the BIA and are not properly part of the record of this appeal, *see* note 3 *supra*; and the documents he has made available to us may not be a complete record and do not reflect why a final determination was apparently never made on the application. The Government suggests that a challenge to the agency's failure to adjudicate a naturalization application is properly made by an action in the district court for a writ of *mandamus*. Pierre at one point brought such an action in the District of Connecticut, but withdrew it without prejudice in 2010. *See* Notice of Voluntary Dismissal, ECF No. 41, consolidated docket 09-cv-1230. We express no views as to the merits of any such action for *mandamus*.

24

naturalizing mother to obtain automatic derivative citizenship, but did not permit the same for such a child of a naturalizing father. We reject this claim.

### 1. *Standing*

Pierre undisputedly has alleged an injury in fact: the inability to obtain automatic derivative citizenship. Whether this injury was traceable to the gender distinction in § 1432(a)(3)'s second clause presents a more difficult question. The statute conferred citizenship on a child upon the mother's naturalization "*if* the child was born out of wedlock and the paternity of the child ha[d] not been established by legitimation." 8 U.S.C. § 1432(a)(3) (emphasis added). Disputing Pierre's standing, the Government notes that his paternity *was* established by legitimation.[11] Because his mother's naturalization alone could not confer automatic citizenship on Pierre, the Government argues, his inability to obtain automatic derivative citizenship was not traceable to the gender distinction in § 1432(a)(3). This argument is not without force. Indeed, it has been adopted by several courts presented with similar equal protection claims. *See Ayton*, 686 F.3d at 338 ("Because [petitioner's] father established [] paternity, [his] mother also would not have been able to confer citizenship . . . [and petitioner's] derivative citizenship claim therefore did not implicate gender-based equal protection principles."); *Barthelemy*, 329 F.3d at 1068 (statute "makes no sex-based distinction when the petitioner has been legitimated"); *Wedderburn*, 215 F.3d at 802 ("[A] legitimated child . . . has no sex-discrimination claim at all [under § 1432(a)(3)].").

Pierre, however, has an alternative cast for his claim of gender discrimination. He faults the statute for disparately treating out-of-wedlock children where one parent has effectively

---

[11] Pierre so alleges, as of course he must to make a claim of derivative citizenship through his father. As to the Government, although it reserves the right to factually dispute Pierre's legitimation, *see supra* note 9, it has assumed for the purposes of this appeal that Pierre was legitimated.

25

abandoned the child. As he notes, § 1432(a)(3) allowed a mother to pass her American citizenship to her child when the father, by failing to legitimate the child, had absented himself from the child's life; but it did not allow a father (like Lavaud) to pass his American citizenship to his child where the mother (like Marie) had similarly abandoned the child. Pierre's injury-in-fact (his inability to receive automatic derivative citizenship) was traceable to this form of alleged gender discrimination, and, depending on the remedy, a finding that § 1432(a)(3) improperly thus classified based on gender could, potentially, redress that injury. He therefore has Article III standing to bring this claim.[12]

### 2. *Equal Protection*

On the merits, however, Pierre's claim of impermissible gender discrimination fails. On this issue, the Supreme Court's decision in *Nguyen* supplies valuable guidance. At issue there was a restrictive citizenship requirement that applied to an illegitimate foreign-born child of an American father, but not to an illegitimate foreign-born child of an American mother. *Nguyen* recognized two important government interests justifying that discrimination: (1) assuring that a biological parent-child relationship exists; and (2) assuring that the child and its citizen parent had a demonstrated opportunity to develop an actual relationship. 533 U.S. at 62, 64-65. The Court further recognized that "gender specific terms can mark a permissible distinction" in attempting to achieve these goals. *Id.* at 64.

---

[12] In a separate challenge to standing, the Government argues that, inasmuch as the reference in the second clause of § 1432(a)(3) was to the gender of the parent, not the child, any claim of gender discrimination belonged to Lavaud, not Pierre. The doctrine of third-party standing, however, imposes only a prudential, not a constitutional, limitation, and challenges to third-party standing need not be resolved where "an adverse answer on the merits question is dictated by Supreme Court precedent." *Grant v. U.S. Dep't of Homeland Sec.*, 534 F.3d 102, 106 n.3 (2d Cir. 2008) (citing *Miller v. Albright*, 523 U.S. 420, 445–47 (1998); *Turley v. Police Dep't of the City of N.Y.*, 167 F.3d 757, 761 (2d Cir. 1999)). Such is the case here.

In light of *Nguyen*, the gender classification in § 1432(a) was justified. It reflected the practical reality that the interests of the alien father merited protection only where that father had legitimated the child and thereby demonstrated a connection to the child. By contrast, no such act of formal legitimation was necessary with respect to an alien mother, because children are inherently legitimated by their mothers at the moment of birth. As the Supreme Court put the point in *Nguyen*, as to mothers, "the opportunity for a meaningful relationship between citizen parent and child inheres in the very event of birth, an event so often critical to our constitutional and statutory understandings of citizenship." *Id.* at 65.

Indeed, twice previously, we have explained, and approved, for this very reason, the gender-specific provision in § 1432(c). In *Lewis*, *supra*, we stated: "The third [subsection of § 1432(a)] applies when the custodial mother naturalizes and the father has not bothered to legitimate his child. In all of these cases, the alien parent has been removed, or removed themselves, from the child's life to some significant degree, such that their parental rights receive less respect." 481 F.3d at 131. And, in *Grant*, *supra,* presented with a similar gender-based challenge to the statute, we held that the logic of *Nguyen* required upholding § 1432(a)(3):

> Although Section 1409(a)(4) [the statute at issue in *Nguyen*] gives the citizen father more paths to establishing that the alien child is his son or daughter than does Section 1432(a), which requires legitimation, Section 1409(a) also imposes an additional requirement absent from Section 1432(a) by demanding that paternity be established by clear and convincing evidence, 8 U.S.C. § 1409(a)(1). Although the burdens imposed by the two statutes are different, we cannot say that Section 1432(a) imposes a significantly more onerous burden than Section 1409(a) with regard to legitimation, and we therefore believe that *Tuan Anh Nguyen* requires us to deny review of Grant's claim.

*Grant*, 534 F.3d at 107–08; *see also Bartholemy*, 329 F.3d at 1068. Put differently, it was no violation of equal protection for the statutory scheme to require a naturalizing, unwed father to *apply* for citizenship for his child, rather than grant it automatically. *See Marquez-Morales*, 377

27

F. App'x at 365 ("Congress is entitled to prescribe rules for citizenship that reflect differences in the way unmarried parents establish a biological tie to the alien child.").[13]

We therefore reject Pierre's challenge to § 1432(a)(3) based on his claim of gender discrimination.

## CONCLUSION

For the reasons stated above, we reject Pierre's challenge to the constitutionality of § 1432(a)(3). To summarize:

(1) Pierre's argument based on the constitutional avoidance canon is barred by the plain language of the statute.

(2) We reject, on the merits, Pierre's Equal Protection Clause claim based on purported legitimacy discrimination.

(3) We reject, on the merits, Pierre's Equal Protection Clause claim based on gender discrimination.

Pierre's petition for review is DENIED.

---

[13] We similarly reject Pierre's claim that the second clause of § 1432(a)(3) was ambiguous. Although reading the word "mother" to mean "mother and father" or "the custodial parent" would eliminate any basis for claiming gender discrimination, *see Grant*, 534 F.3d at 106, such a reading would defy the statute's plain language. And it would make the balance of that clause, which addresses situations where paternity has *not* been established, nonsensical. *See United States v. Smith*, 499 U.S. 160, 167 (1991) ("'Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of contrary legislative intent.'" (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980))).