*Omar Everton Dale v. William P. Barr, United States Attorney General*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: November 4, 2019     Decided: July 23, 2020)

Docket No. 18-1081

───────────────────

OMAR EVERTON DALE, AKA OMAR DALE,
*Petitioner*,

v.

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,
*Respondent*.

───────────────────

On Petition for Review of a Final Order
of the Board of Immigration Appeals.

───────────────────

Before:     SACK AND HALL, *Circuit Judges*, AND RAKOFF, *District Judge*.[1]

Petitioner Omar Everton Dale seeks review of two decisions of the Board of

Immigration Appeals, the first of which affirmed a decision by an Immigration

Judge ordering Dale removed from the country pursuant to the Immigration and

Nationality Act; and the second of which affirmed a decision by an Immigration

---

[1] Judge Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

Judge denying Dale's motion to reopen his immigration case. Dale raises two arguments in his petition for review. First, he contends that a former provision of the Immigration and Nationality Act that, although it has been repealed and replaced by a new law, remains applicable to him, violates his right to equal protection under the Constitution by not allowing him to derive citizenship through his father's naturalization when it would have allowed him to derive citizenship had his mother naturalized. Second, Dale asserts that if we disagree with his equal protection argument, we should nonetheless remand his case to the BIA for it to consider, in the first instance, whether his conviction for assault in the second degree under NYPL § 120.05(2) is an aggravated felony crime of violence. Because both arguments are precluded by previous decisions of this Court, the petition for review is:

DENIED.

JUDGE RAKOFF filed a concurring opinion.

> NICHOLAS J. PHILLIPS, Prisoners' Legal Services of New York, Buffalo, NY, *for Petitioner.*
>
> SARAH A. BYRD (Joseph H. Hunt and Linda S. Wernery, *on the brief*), Office of Immigration Litigation, United States

Department of Justice, Washington, D.C.,
*for Respondent.*

Sack, *Circuit Judge*:

Petitioner Omar Everton Dale ("Dale") seeks review of two decisions by the United States Board of Immigration Appeals ("BIA"), the first of which affirmed a decision by an Immigration Judge ("IJ") ordering him removed from the country pursuant to the Immigration and Nationality Act[2] (the "INA"), 8 U.S.C. § 1227; and the second of which affirmed a decision by an IJ denying his motion to reopen his case. Dale raises two arguments in his petition for review: that a former provision of the INA that remains applicable to him violates his constitutional right to equal protection by not allowing him to derive citizenship through his father's naturalization when it would have allowed him to derive citizenship had his mother naturalized; and, in the alternative, that we should return the matter to the BIA to determine in the first instance whether a conviction for assault in the second degree under New York Penal Law § 120.05(2) qualifies as an aggravated felony crime of violence for purposes of the INA. Bound by precedent, we conclude that both arguments fail and therefore deny the petition.

---

[2] 8 U.S.C. ch. 12 (§§ 1101, 1151–1157, 1181–1182, 1201, 1255, 1259, 1322, 1351).

# BACKGROUND

A. *Factual Background*

In September 1979, Petitioner Dale was born to an unwed couple in Kingston, Jamaica. Dale's mother, Sandra Locke, and his father, Ludlow Dale, were both citizens of Jamaica. The two never legally married.

In May 1981, Dale and his mother were admitted to the United States as lawful permanent residents. Less than a month later, in June 1981, Dale's father came separately to the United States and was also admitted as a lawful permanent resident.

Dale spent his childhood living in the New York City home of his maternal grandmother. From time to time, his mother lived there too, but he was primarily raised by his grandmother. Dale never shared a home with his father.

In 1984, Dale's father enlisted in the United States Army. Then, in 1988, he became a naturalized United States citizen. In March 1989, less than a year later, he obtained an order of filiation from the New York State Family Court, Queens County, declaring him to be Dale's father.

In October 1997, after being convicted of a crime or crimes unspecified in the record, Dale's mother was deported from the United States without having

become a United States citizen. After his mother's removal, Dale continued living with his maternal grandmother in New York.

Beginning in 2004, Dale was convicted of a string of criminal offenses including petit larceny, in violation of New York Penal Law ("NYPL") § 155.25, in 2004; possession of cocaine, in violation of NYPL § 220.03, in 2008; possession of 3,4-Methylenedioxymethamphetamine (commonly known as "MDMA"), in violation of NYPL § 220.03, in 2011; assault in the third degree, in violation of NYPL § 120.00(1), in 2011; and assault in the second degree, in violation of NYPL § 120.05(2), in 2014. *See In the Matter of Omar Everton Dale*, Notice to Appear in Removal Proceedings under Section 240 of the INA, Jan. 13, 2017, at 3.

B. *Procedural History*

On January 13, 2017, the United States Department of Homeland Security ("DHS") initiated removal proceedings against Dale. *Id.* at 1. The DHS served Dale with a Notice to Appear ("NTA") ordering him to appear for a removal hearing before an IJ of the United States Department of Justice. *Id.* at 1-2.

The NTA alleged that Dale was not a citizen of the United States and that he was subject to removal from the country pursuant to three provisions of federal law. *Id.* at 3. First, the NTA asserted, Dale was removable pursuant to section

237(a)(2)(A)(ii) of the INA (8 U.S.C. § 1227 (a)(2)(A)(ii)) for having been convicted of two crimes involving moral turpitude; second, Dale was removable pursuant to section 237(a)(2)(A)(iii) of the INA (8 U.S.C. § 1227(a)(2)(A)(iii)) for having been convicted of an aggravated felony crime of violence as defined in 18 U.S.C. § 16; and third, Dale was removable pursuant to section 237(a)(2)(B)(i) of the INA (8 U.S.C. § 1227(a)(2)(B)(i)) for having been convicted of an offense relating to a controlled substance. *Id.* at 3-4.

On April 21, 2017, Dale appeared by video at a hearing before an IJ. Through his attorney, Dale admitted that he had been convicted of the various offenses alleged in the NTA but argued that he was not removable from the country because he had "derived citizenship through his father's naturalization." Administrative Record ("AR") at 145. The IJ invited Dale's attorney to submit legal authority in support of that argument and scheduled a hearing for June 16, 2017.

On June 7, 2017, Dale's attorney filed a memorandum asserting that Dale had derived citizenship from his father's naturalization under a former section of the INA, previously codified at 8 U.S.C. § 1432(a). "In 2000, § 1432(a) was repealed and replaced by a different provision governing automatic derivative citizenship, the Children Citizenship Act (CCA) of 2000." *Pierre v. Holder*, 738 F.3d 39, 45 n.4

6

(2d Cir. 2013). Since then, questions of derivative citizenship have been controlled

by a section of the CCA codified at 8 U.S.C. § 1431(a); the CCA, however, "does

not confer citizenship retrospectively." *Drakes v. Ashcroft*, 323 F.3d 189, 191 (2d Cir.

2003). As a result, the former § 1432(a)(3), "the law in effect when [Dale]" contends

that he "fulfilled the last requirement for derivative citizenship," *Poole v. Mukasey*,

522 F.3d 259, 264 (2d Cir. 2008) (internal quotation marks omitted), controls Dale's

claim.

At the relevant time, section 1432(a) provided that:

A child born outside of the United States of alien parents, or
of an alien parent and a citizen parent who has subsequently
lost citizenship of the United States, becomes a citizen of the
United States upon fulfillment of the following conditions:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of
the parents is deceased; or

(3) The naturalization of the parent having legal custody of
the child when there has been a legal separation of the
parents or the naturalization of the mother if the child was
born out of wedlock and the paternity of the child has not
been established by legitimation; and if

(4) Such naturalization takes place while such child is
under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to

a lawful admission for permanent residence at the time
of the naturalization of the parent last naturalized under
clause (1) of this subsection, or the parent naturalized
under clause (2) or (3) of this subsection, or thereafter
begins to reside permanently in the United States while
under the age of eighteen years.

8 U.S.C. § 1432(a).

Dale's attorney focused her argument on subsection (3), which, to repeat, provided that a child, who (like Dale) was a lawful permanent resident, who was "born outside of the United States of alien parents . . . , bec[ame] a citizen of the United States upon . . . naturalization of [the] mother if the child was born out of wedlock and the paternity of the child ha[d] not been established by legitimation." 18 U.S.C. § 1432(a)(3). According to Dale's attorney, subsection (3) "suggest[ed] that if paternity of [Dale] ha[d] been established by legitimation, then [Dale] could have derived citizenship through his father's naturalization." AR at 296-97. Thus, counsel contended, because Dale's father had "legitimated" Dale by receiving an order of filiation with respect to Dale and had "naturalized before [Dale] turned 18," both of which occurred before 2000, Dale should be considered a U.S. citizen "through derivation."[3]  AR at 297.

---

[3] "You can acquire U.S. citizenship at birth (acquisition) *or you can derive citizenship from your parents after your birth but before the age of 18 (derivation)*."  Citizenship Through

DHS responded to Dale's argument by memorandum dated July 18, 2017.

DHS contended that the issue of legitimation that Dale had attempted to raise was

"entirely irrelevant" to the question of Dale's citizenship inasmuch as even if Dale

had been "legitimated" by his father, the second sub-clause of section 1432(a)(3)

required his *mother* to have naturalized, an event Dale conceded had never

occurred.  AR at 253-54.

On September 22, 2017, the IJ issued an oral decision concluding, among

other things, that DHS had "established by clear and convincing evidence . . . that

[Dale] d[id] not derive citizenship under former Section 321 of the Immigration

and Nationality Act."  AR at 129.  Dale was thus a citizen of Jamaica and not the

United States.  *Id.*  The IJ addressed Dale's specific argument regarding citizenship

---

Parents, U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
https://my.uscis.gov/exploremyoptions/citizenship_through_parents (last visited July 2, 2020) (emphasis added).

Dale has never alleged that he derived citizenship under subsections (a)(1) or (2) and has presented nothing to indicate that he met the requirements for citizenship under those subsections.

Because we ultimately conclude that Dale's argument as to the unconstitutionality of former Section 321 of the INA fails, we need not address whether, were it otherwise, an order that he be considered a U.S. citizen through derivation, as he appears to assert, would be an appropriate remedy.  *See  Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017), discussed at note 6, *infra*.

under section 1432(a)(3), concluding that for Dale to have derived citizenship under that subsection, his mother would have had to have been naturalized. It was uncontested that she had not.

Having determined that Dale was not a citizen, the IJ turned to the question of removability. As described above, the DHS had initially alleged that Dale was removable under three provisions of the INA. The DHS had, however, withdrawn the third charge of removability during a hearing in July 2017. Addressing the remaining charges in the reverse order presented by the NTA, the IJ first concluded that Dale was removable under section 237(a)(2)(A)(iii) of the INA because his conviction for assault in the second degree under NYPL § 120.05(2) qualified as an aggravated felony crime of violence. Second, and in addition, the IJ concluded that Dale's convictions for petit larceny, assault in the third degree, and assault in the second degree each constituted a crime involving moral turpitude that arose out of separate schemes of criminal misconduct; consequently, the IJ ruled, Dale was also removable pursuant to section 237(a)(2)(A)(ii) of the INA. The IJ therefore ordered Dale to be removed from the United States to his birth country of Jamaica.

10

On October 10, 2017, Dale filed a motion with the IJ to reopen his case. In it, Dale asserted that he had recently obtained his father's 1989 order of filiation from the New York State Family Court, Queens County. Dale contended that this order established that he had been legitimated by his father, and it thus served as "material evidence" supporting his claim to derivative citizenship under section 1432(a)(3). AR at 113. He argued that that provision provided "derivative citizenship for children [such as himself] born out of wedlock whose paternity has been established by legitimation" so long as the father had naturalized. *Id.*

On October 20, 2017, the IJ denied Dale's motion to reopen, concluding that the newly submitted evidence "does not materially affect [the IJ's] prior analysis and decision." AR at 105.

Dale timely appealed both the IJ's decision finding him removable and the decision denying his motion to reopen to the BIA.

On March 14, 2018, the BIA issued an order dismissing Dale's appeal of the IJ decision finding him removable. Special Appendix ("SPA") at 2. It "disagree[d]" with Dale's contention that he had "derived United States citizenship through the naturalization of his father . . . pursuant to former . . . 8 U.S.C. § 1432(a)(3)." *Id.* The BIA concluded, citing *Pierre v. Holder*, 738 F.3d 39, 55-57 (2d Cir. 2013), that

former section 1432(a)(3) "did not provide any means for a child born out of wedlock to derive citizenship solely through the naturalization of the *father*, as [Dale] attempts to do." *Id.* Thus, because Dale had "not disputed his removability" on any other ground, "nor ha[d] he requested any form of relief or protection from removal," the BIA dismissed his appeal and affirmed the IJ's order of removal. *Id.* at 3.

The same day, the BIA issued a separate decision dismissing Dale's appeal of the IJ's denial of his motion to reopen. SPA at 5. The BIA concluded that Dale's "new evidence did not provide a valid basis for reopening because it was not material to his eligibility for derivative citizenship under former section [8 U.S.C. § 1432(a)(3)]." *Id.*

Dale timely petitioned for review of both decisions of the BIA.

## DISCUSSION

Dale raises two arguments in his petition for review: First, he contends that by treating unwed fathers differently from unwed mothers, former section 1432(a)(3) violates the Constitution's equal protection guarantee. As a remedy, Dale urges us in effect to cure section 1432(a)(3)'s alleged constitutional infirmity by reading it atextually to allow him — and all other similarly situated lawful

permanent residents — to derive American citizenship from a father's naturalization as it would allow a child to derive citizenship from a mother's naturalization. Second, and "in the alternative," Dale asserts that if we reject this argument and deny his claim for citizenship, we should "nonetheless" remand his case to the BIA for it to re-consider whether a conviction for assault in the second degree under NYPL § 120.05(2) qualifies as an aggravated felony crime of violence. Pet. Br. at 2. Because we conclude that both of Dale's arguments are precluded by previous decisions of this Court, the petition for review is denied.

A. *Constitutionality of Former Section 1432(a)(3)*

We review questions of law, including constitutional claims, *de novo*. *See Gjerjaj v. Holder*, 691 F.3d 288, 292 (2d Cir. 2012).

Dale's allegation that application of former section 1432(a)(3) as written violates his right to equal protection begins by acknowledging, as it must, that we rejected this argument in *Pierre v. Holder*, 738 F.3d 39 (2d Cir. 2013).

The facts of *Pierre* are roughly similar to those underlying the case at bar. There, the petitioner (Pierre) was born in 1978 in Haiti to a mother and father who were never married. *Id.* at 43. When Pierre was "a young age," *id.*, his mother abandoned him. *Id.* Pierre's father moved to the United States in 1981. His father

became a naturalized citizen in 1992. *Id.* The following year, "Pierre came to the United States as a lawful permanent resident to live with his father." *Id.* Thereafter, except when incarcerated, Pierre lived with his naturalized father. *Id.* Beginning in 2001, Pierre was convicted of several criminal offenses. *Id.* at 44. In 2008, after he had served prison sentences for his convictions, the government initiated removal proceedings against him. *Id.*

Pierre argued before the BIA that under former section 1432(a)(3) he could not be removed because he had acquired derivative citizenship through his father's naturalization. *Id.* The BIA rejected the argument. *Id.*

In his appeal to this Court, Pierre raised, among others, the argument that Dale now asserts — that the second clause of former section 1432(a)(3) was applicable and violated his constitutional right to equal protection by "permit[ting] an out-of-wedlock child of a naturalizing mother to obtain automatic derivative citizenship" while "not permit[ting] the same for such a child of a naturalizing father." *Id*. at 56.[4]

---

[4] Before reaching the merits of Pierre's claim, we addressed the "difficult question" of whether he had standing to assert it. *Id.* at 56-7. Although we noted that the government's argument that Pierre lacked standing was "not without force," *id.* at 56, we concluded that he had standing because his "injury-in-fact," that is, "his

Our analysis of Pierre's argument relied on the Supreme Court's decision twelve years earlier in *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001) as a source of "valuable guidance." *Pierre*, 738 F.3d at 57. *Nguyen* addressed a law that governed the "acquisition of United States citizenship" by children born outside the United States to unmarried parents where only one of the parents was a United States citizen. 533 U.S. at 56. The law in question "impose[d] different requirements for the child's acquisition of citizenship depending upon whether the citizen parent [was] the mother or the father." *Id.* at 56-57. In the former instance — i.e., where the mother was a citizen — the statute allowed her citizenship to transmit to the child so long as she had previously been physically present in the United States for a continuous period of one year. *Id.* at 60. In the latter circumstance, however, — i.e., where the father was a citizen — the statute required, for citizenship to be transmitted, "one of three" additional and "affirmative steps to be taken" before the child turned eighteen: "legitimation; a declaration of paternity under oath by the father; or a court order of paternity." *Id.* at 62.

---

inability to receive automatic derivative citizenship," "was traceable to" former section 1432(a)(3)'s "alleged gender discrimination," *id.* at 57.

For this type of "gender-based classification to withstand equal protection scrutiny," the Court said, the government was required to establish, at a minimum, that the classification "serve[d] 'important government objectives.'" *Id.* at 60 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

The Court determined that the law's gender classification was "justified by two important governmental objectives." *Id.* at 62. First, the gender classification helped "assur[e]" the "exist[ence]" of a "biological parent-child relationship." *Id.* "Fathers and mothers," the Court wrote, "are not similarly situated with regard to the proof of biological parenthood." *Id.* at 63. A mother's relationship to her child "is verifiable from the birth itself," as a "mother's status is documented in most instances by the birth certificate or hospital records and the witnesses who attest to her having given birth." *Id.* at 62. By contrast, a father's relationship to his child is not so easily verified; "the uncontestable fact is that [the father] need not be present" at the event of birth. *Id.* And even if he is, "that circumstance [alone] is not incontrovertible proof of fatherhood." *Id.* Thus, in light of this biological distinction, that the statute "impos[ed] . . . a different set of rules for making [a] legal determination with respect to fathers and mothers [was] neither surprising nor troublesome from a constitutional perspective." *Id.* at 63.

Second, the statute's gender classification was warranted by the government's interest in

> ensur[ing] that the child and the citizen parent have
> some demonstrated opportunity or potential to develop not just
> a relationship that is recognized, as a formal matter, by the law,
> but one that consists of the real, everyday ties that provide
> a connection between child and citizen parent and, in turn, the
> United States.

*Id.* at 64-65. "In the case of a citizen mother and a child born overseas, the opportunity for a meaningful relationship between citizen parent and child inheres in the very event of birth." *Id.* at 65. That a mother and her child share the event of birth provides "an opportunity for [them] to develop a real, meaningful relationship." *Id.* "The same opportunity," however, "does not" necessarily obtain "in the case of the unwed father" because of the unfortunate reality that "it is not always certain that a father will know that [his] child was conceived, nor is it always clear that even the mother will be sure of the father's identity." *Id.*

The law in question therefore comported with equal protection principles by helping perform the "critical[ly] importan[t]" task of "ensuring some opportunity for a tie between citizen father and foreign born child" that could serve as "a reasonable substitute for the opportunity manifest between mother and child at the time of birth." *Id.* at 66.

17

This Court reached its conclusion in *Pierre* "[i]n light of" the Supreme Court's reasoning in *Nguyen*. *Pierre*, 738 F.3d at 57. "[T]he gender classification in § 1432(a)[3] was justified," we decided, because it "reflected the practical reality that the interests of the alien father merited protection only where that father had legitimated the child and thereby demonstrated a connection to the child." *Id.* "By contrast," we continued, "no such act of formal legitimation was necessary with respect to an alien mother, because children are inherently legitimated by their mothers at the moment of birth." *Id.*

In *Pierre*, we asserted, moreover, that we were not breaking any new ground inasmuch as we had five years before, in *Grant v. U.S. Dep't of Homeland Sec.*, 534 F.3d 102 (2d Cir. 2008), already "held that the logic of *Nguyen* required upholding § 1432(a)(3)" in "a similar gender-based challenge to" the statute. *Pierre*, 738 F.3d at 58.

Acknowledging as he must the holding of *Pierre*, Dale nonetheless contends that that decision has been "invalidate[d]" by the Supreme Court's more recent decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017). Pet. Br. at 14.

*Morales-Santana* was decided on appeal from this Court's decision in *Morales-Santana v. Lynch*, 804 F.3d 520 (2d Cir. 2015). There, we addressed an equal

protection challenge to a statute that provided that a child born abroad to an unwed citizen mother and non-citizen father became a citizen at birth "so long as the mother was present in the United States or one of its outlying possessions for a continuous period of *at least one year* at some point prior to the child's birth." *Id.* at 523 (emphasis added) (citing 8 U.S.C. § 1409(c)). "By contrast," under the statute,

> a child born abroad to an unwed citizen father and
> non-citizen mother ha[d] citizenship at birth only if the father
> was present in the United States or one of its outlying possessions
> prior to the child's birth for a period or periods totaling *at least*
> *ten years*, with at least five of those years occurring after the age
> of fourteen.

*Id.* (emphasis added).

The statute's gender classification was thus stark: to transmit citizenship in these circumstances, mothers needed to have been physically present in this country for one year, while fathers were required to have been here for ten. The statute, we concluded, could not withstand scrutiny.

In its attempt to justify the gender classification, the government "relie[d] on *Nguyen* to explain why the different physical presence requirements for unwed men and women reflect[ed] a concern with ensuring an adequate connection between the child and the United States." *Id.* at 530. But "we [were] not persuaded." *Id.* "[W]e s[aw] no reason [] that unwed fathers need more time than

unwed mothers in the United States prior to their child's birth in order to assimilate the values that the statute seeks to ensure are passed on to citizen children born abroad." *Id*. In other words, we continued, while we "agree[d] [with the government] that unwed mothers and fathers are *not* similarly situated with respect to the two types of parent-to-child 'ties' justifying the legitimation requirement at issue in *Nguyen . . .* unwed mothers and fathers *are*," we concluded, "similarly situated with respect to *how long* they should be present in the United States or an outlying possession prior to the child's birth in order to have assimilated citizenship-related values to transmit to the child." *Id.* at 531. (emphasis in original). In *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), the Supreme Court affirmed the judgment of this Court, except for the relief we had prescribed — the effective granting of citizenship to the petitioner.[5]

Examining the history of the law in question, the Court explained that 8 U.S.C. § 1409 had been "proposed" by President Franklin Delano Roosevelt's administration in 1940 to assuage fears that "foreign-born child[ren]" of unwed

---

[5] "While the equal protection infirmity in retaining a longer physical-presence requirement for unwed fathers than for unwed mothers is clear, this Court is not equipped to grant the relief Morales-Santana seeks, *i.e.*, extending to his father (and, derivatively, to him) the benefit of the one-year physical-presence term §1409(c) reserves for unwed mothers." *Id.* at 1698.

parents could "turn out 'more alien than American in character.'" *Id.* at 1692 (quoting Hearings on H.R. 6127 before the House Committee on Immigration and Naturalization, 76th Cong., 1st Sess., 43, 426-27 (1940)). The physical presence requirement was thought to be a straightforward remedy to this problem: Roosevelt's "administration believed that a citizen parent with lengthy ties to the United States would counteract the influence of the alien parent." *Id.* But with that remedy, Congress (and the Roosevelt administration) baked into the statute gender stereotypes that at one point in our nation's history may have been considered "habitual, but are now untenable." *Id.* at 1690-91. According to those "familiar stereotype[s]," "unwed citizen fathers" "would care little about, and have scant contact with, their nonmarital children," *id.* at 1962, while unwed citizen mothers would — in presumably all instances — act as the "child's natural and sole guardian," *id.* at 1691. A citizen mother, our government at the time therefore thought, needed to display a tie to this country only one tenth as strong as a father would need to "counteract" the "alien" influence the other, non-citizen parent risked imposing on the child. *Id.* at 1962. In other words, the government concluded that because an unwed father was presumed to be "out of the picture," *id.*, the mother needed only one year of physical presence in this country to

counteract his influence on the child; by contrast, because a mother was presumed to always be a part of the child's upbringing, in the circumstance where she was an alien, an unwed citizen father would need ten years of physical presence in this country to outweigh her influence. *Id.*

Because the law in question was so clearly "infect[ed]" by these "gender-based" stereotypes, the *Morales-Santana* Court agreed with this Court that it "violate[d] the equal protection principle" implicit in the Fifth Amendment.[6]  *Id.* at 1700-01.  But, crucially, the Court made clear, as we had two years earlier, that its decision "d[id] not renew the contest over [the] paternal-acknowledgement requirement" contained in the statute at issue in *Nguyen*.  *Id.* at 1694.

> Unlike the paternal-acknowledgment requirement at issue in *Nguyen* . . . the physical-presence requirements now before us relate solely to the duration of the parent's prebirth residency in the United States, not to the parent's filial tie to the child.  As the Court of Appeals observed in this case, a man needs no more time in the United States than a woman "in order to have assimilated citizenship-

---

[6] Dale argues that the former section 1432(a)(3) violates the Equal Protection Clause, but he does not specify which constitutional amendment guarantees him the right to equal protection in this precise situation.  As the Court explained in *Morales-Santana*, "the applicable equality guarantee [for federal legislation] is not the Fourteenth Amendment's explicit Equal Protection Clause, it is the guarantee implicit in the Fifth Amendment's Due Process Clause."  137 S. Ct. at 1686 n.1.  Dale's lack of specificity does not alter our analysis or have an impact on our reliance on *Pierre* because the "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."  *Id.* (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975)).

related values to transmit to [his] child." [*Morales-Santana v. Lynch*,] 804 F.3d, at 531. And unlike *Nguyen*'s parental-acknowledgment requirement, [the] age-calibrated physical-presence requirements [in the statute before the Court] cannot fairly be described as "minimal." [*Nguyen*,] 533 U.S., at 70.

*Morales-Santana*, 137 S. Ct. at 1694.

Dale asserts that the Supreme Court's decision in *Morales-Santana* requires that we "overrule *Pierre* in light of the anachronistic stereotypes and generalizations" that decision relied upon to "uphold the constitutionality of" the former section 1432(a)(3). Pet. Br. at 20. However sympathetic we might be to the petitioner's point of view, we cannot do what he asks. "It is a longstanding rule of our Circuit that a three-judge panel is bound by a prior panel's decision until it is overruled either by this Court sitting *en banc* or by the Supreme Court." *Doscher v. Sea Port Group Securities, LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (citations omitted).

To be sure, there are situations in which this general rule does not apply. "[W]here an intervening Supreme Court decision casts doubt on the prior ruling," *id.* (internal quotation marks omitted), we are not bound to follow that prior ruling. But "[t]o qualify as [such] an intervening decision, the Supreme Court's conclusion in a particular case must have broken the link on which we premised our prior decision, or undermined an assumption of that decision." *Id.* (internal

23

quotation marks, citations, and alterations omitted). And we resort to this exception cautiously, because "[a] less-than-stringent application of the standards for overruling prior decisions not only calls into question a panel's respect for its predecessors but also increases uncertainty in the law by revisiting precedent without cause." *Id.*

The question for us, then, is whether the Supreme Court's decision in *Morales-Santana* either broke the link on which we premised *Pierre* or undermined an assumption of that decision. Supported by the Supreme Court's opinion in *Morales-Santana*, *supra*, we think not.

In *Pierre*, we had upheld the constitutionality of former section 1432(a)(3) essentially by adopting the Supreme Court's reasoning in *Nguyen*. As we put it, the "gender classification" in the former section 1432(a)(3) "was justified" "[i]n light of *Nguyen*." *Pierre*, 738 F.3d at 57. The former section 1432(a)(3), like the statute at issue in *Nguyen*, attempted to ensure the existence of a biological parent-child relationship and allow that relationship a "demonstrated opportunity to develop." *Id.* In its attempt to do so, it treated mothers and fathers differently, not, we concluded, based on some outdated stereotype, but rather on the biological inevitability that a mother, by nature of her status as the parent giving birth,

"inherently legitimate[s]," *id.*, and establishes an immediate biological connection with her child in a way that fathers — as a matter of nature — cannot. The former section 1432(a)(3) did not prevent a father from demonstrating such a connection entirely; it merely required him to acknowledge his child in a more formal manner because he could not do so as a matter of biological course.

The Court in *Morales-Santana* explicitly distinguished statutes, such as the former section 1432(a)(3) which we address here, which contain gender classifications based on biological distinctions, from the statute before it, whose disparate physical-presence requirements were infected by antiquated gender stereotypes. *See Morales-Santana*, 137 S. Ct. at 1700-01. "Unlike the paternal-acknowledgment requirement at issue in *Nguyen*," the Court wrote, "the physical-presence requirements" in the statute before it "relate[d] solely to the duration of the parent's prebirth residency in the United States," and not, like the statute in *Nguyen*, "to the parent's filial tie to the child." *Id.* at 1694. That distinction was integral to the Court's decision. Unlike the process of a parent establishing a filial tie to his or her child, a process, ascribed by the courts to biology, for which men and women (and thus fathers and mothers) are not similarly situated, the amount of pre-birth time a parent must be physically present in the country in order to

later transmit citizenship-related values to his or her child is a matter in which men and women are more than similarly situated – they are virtually the same. As the Court put it: "[A] man needs no more time in the United States than a woman" to pass on "'citizenship-related values.'" *Id.* at 1694 (quoting *Morales-Santana v. Lynch*, 804 F.3d at 531).

The Court continued: "[U]like *Nguyen*'s parental-acknowledgment requirement," the "age-calibrated physical-presence requirements [of the statute at issue] cannot fairly be described as minimal." *Id.* (internal quotation marks omitted).

In other words, we understand the distinction made by the *Morales-Santana* Court between the statute before it and that at issue in *Nguyen* to militate against our interpreting that decision as having cast doubt on *Nguyen* or on *Pierre*, which, for the purposes of this analysis, is substantially the same.

For the same reason we are unconvinced by the concurring opinion's conclusion that the Supreme Court's decision in *Morales-Santana* "effectively refutes the central premises on which *Pierre* rests" because the statutory provision at issue here, and in *Pierre*, suffers from the "same three infirmities" that the Supreme Court used to distinguish *Morales-Santana* from *Nguyen*. Concurring Op.

at 1, 3. The provisions at issue in *Morales-Santana* are fundamentally unlike the provision challenged in *Pierre* and in the instant case in that the *Morales-Santana* statutory requirements did "not [relate] to the parent's filial tie to [a] child," but rather "relate[d] solely to the duration of the parent's prebirth residency in the United States." *Morales-Santana*, 137 S. Ct. at 1694. As we had previously recognized in the decision on appeal, *Morales-Santana v. Lynch*, 804 F.3d at 531, *reversed on other grounds*, 137 S. Ct. 1678 (2017), "mothers and fathers are similarly situated with respect to" the relationship they have with their child "prior to" the child's "birth." There is no substantial inconsistency between *Morales-Santana* and *Pierre* on this point.

The burdens imposed by the provisions in *Morales-Santana* were also far broader and deeper than those imposed by former section 1432(a)(3) addressed in *Pierre*. Under the *Morales-Santana* provisions, if a father had been physically present in this country for less time than the law required, even by just "a few days," 137 S. Ct. at 1695, his child could not become a citizen by dint of his father's citizenship; there was no other course through which the child could derive his father's citizenship. But as *Pierre* recognized, former section 1432(a)(3) was enacted as part of a larger "statutory scheme" that provided an additional route —

former section 1433 — by which a child could derive his father's citizenship so long as the father took a few "modest" and "readily available" steps, the most demanding of which required him to obtain custody over the child. *Pierre*, 738 F.3d at 54-55 (quoting *Lewis v. Gonzales*, 481 F.3d 125, 132 (2d Cir. 2007)). We agree with the Seventh Circuit that it would be "unsound" to read 1432(a)(3) as "independent[]" from the provisions of section 1433. *Wedderburn v. I.N.S.*, 215 F.3d 795, 800 (7th Cir. 2000). The same is not true, of course, for the provisions at issue in *Morales-Santana* — the ten (later five) years of physical presence required by those provisions was an unavoidable, fundamental requirement for the child's citizenship through his father's. The burdens imposed by former section 1432(a)(3), real though they are, pale in comparison to those imposed by the pre-birth presence requirement of the provisions considered in *Morales-Santana*.

Finally, we note, since *Morales-Santana*, five judges of this Court and a judge from the Southern District of New York sitting by designation have reached the same conclusion, albeit in two non-precedential summary orders.[7]

---

[7]     In *Gonzales-Reyes v. Whitaker*, 757 F. App'x 21 (2d Cir. 2018 (summary order), a petitioner facing an order of removal "argue[d] that the Supreme Court's decision in [*Morales-Santana*] [was] an intervening decision that overrule[d] or abrogate[d] *Pierre*." *Id.* at 25. We concluded that "[t]he reasoning in *Morales-Santana* does not extend to [the former] § 1432(a)(3)," *id.*, because the statute in *Morales-Santana* "based its different

We do not doubt that allowing the law to treat unwed mothers and unwed fathers differently based on a "biological inevitability" may reflect outdated notions of gender and parenthood. We conclude that we are nonetheless bound by our decision in *Pierre*. We cannot steer around binding precedent even were we not to agree with it. Neither can we ignore the explicit distinction *Morales-Santana* drew between the statute before the Court in that case, and statutes, like those at issue in *Nguyen* and *Pierre*, which require "minimal" "paternal-acknowledgment[s]." *Morales-Santana*, 137 S. Ct. at 1694.

B.      *Whether NYPL Section 120.05(2) is an*
        *Aggravated Felony Crime of Violence*

Dale argues that in the event we reject his constitutional challenge to the former section 1432(a)(3), as indeed we do, we should "nonetheless remand this case so that the [BIA] can consider, in the first instance, whether [his] conviction

---

residency requirements on stale gender stereotypes," *id.* at 26 and not the biological differences discussed in *Pierre*. "We conclude[d] that *Pierre*" had therefore "not been abrogated by *Morales-Santana*." *Id.* at 26.

In *Cartagena v. Barr*, 791 F. App'x 258 (2d Cir. 2019) (summary order), another petitioner facing removal similarly "argue[d] that the Supreme Court's decision in [*Morales-Santana*] overrule[d] *Pierre*." *Id.* at 260. Again, we concluded that "[i]t does not." *Id.* We again explained that the gender classification at issue in *Morales-Santana* "violated equal protection because it . . . relied on an outdated and unjustifiable understanding of gender roles." *Id.* By contrast, because the former section 1432(a) "does not rely on outdated stereotypes," we ruled for a second time that "*Morales-Santana* does not implicate [the former] § 1432(a)(3) and Pierre [still] controls." *Id.*

for Assault in the Second Degree under NYPL § 120.05(2) is an aggravated felony crime of violence under 18 U.S.C. § 16(a)." Pet. Br. at 23.

As noted above, the IJ concluded that Dale was removable under section 237(a)(2)(A)(iii) of the INA, which provides that an alien who is convicted of "an aggravated felony at any time after admission is deportable" from the United States. 8 U.S.C. § 1227(a)(2)(A)(iii). The INA defines the term "aggravated felony" to include "a crime of violence (as defined in section 16 of title 18, but not including a purely political offense) for which the term of imprisonment [is] at least one year." 8 U.S.C. § 1101(a)(43)(F).

The IJ determined that Dale's conviction for assault in the second degree under NYPL § 120.05(2) qualified as an aggravated felony crime of violence.

In *Morris v. Holder*, 676 F.3d 309, 312 (2d Cir. 2012), we concluded that "second-degree assault under [NYPL] § 120.05(2) [] constitute[s] a 'crime of violence' within the meaning of 18 U.S.C. § 16(b) and an 'aggravated felony' under 8 U.S.C. § 1101(a)(43)(F)." *Id.* at 312. As Dale correctly points out, however, the Supreme Court, in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018), thereafter held that the residual clause in 18 U.S.C. § 16(b) was void for vagueness. He contends

that his conviction under NYPL § 20.05(2) therefore can only be a crime of violence if the elements of his offense meet one of the requirements of 18 U.S.C. § 16(a).

As we said in *Singh v. Barr*, 939 F.3d 457 (2d Cir. 2019) (*per curiam*), a case decided after the briefing in this case was complete, "[a]fter *Dimaya* . . . an offense can be deemed a crime of violence only under 18 U.S.C. § 16(a), which requires that the offense have 'as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *Id.* at 461-62 (quoting 18 U.S.C. § 16(a)). There, we held that NYPL § 120.05(2) satisfies this test and is a crime of violence under 18 U.S.C. § 16(a). *Id.* at 464. We conclude that Dale's "alternative" argument for remand, that the BIA must consider in the first instance whether Dale's conviction for assault in the second degree under NYPL § 120.05(2) is an aggravated felony crime of violence under 18 U.S.C. § 16(a) is thus precluded by *Singh*, which holds that indeed it is and that remand is unnecessary in this circumstance.

## CONCLUSION

Because we conclude that both of Dale's arguments are unavailing under the law of this Circuit, the petition for review is **DENIED**.

RAKOFF, D.J., concurring:

I agree with the majority that a lower court should hesitate before concluding that an intervening Supreme Court decision has so undercut the premise on which a prior ruling of the lower court is based as to effectively overrule the prior precedent. But I cannot avoid the conclusion that this is just such a case. To put it plainly, § 1432(a)(3) unconstitutionally discriminates on the basis of sex in a way that no longer even comes close to passing constitutional muster.

In *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017), the Supreme Court invalidated a provision of the Immigration and Nationality Act ("INA") because it reflected what were "once habitual, but now untenable, assumptions" about "the way women and men are." *Id.* at 1690-91, 1694. Omar Dale challenges a different provision of the very same Act that, in awarding unwed mothers a path to automatic citizenship for their children that is unavailable to unwed fathers, relies on and perpetuates the very same stereotypes. The majority nonetheless upholds the provision as nondiscriminatory, arguing that this Court's decision in *Pierre v. Holder*, 738 F.3d 39 (2d Cir. 2013), compels it to do so. *Morales-Santana*, however, effectively refutes the central premises on which *Pierre* rests.

1

Nevertheless, what follows is a concurring opinion because the remedy for the discrimination Dale challenges would not ultimately result in his obtaining citizenship.[1]

Like the Supreme Court, the Second Circuit has often been too slow to recognize that the Fifth and Fourteenth Amendments require that men and women be treated equally. Thus, in *Pierre*, this Court, viewing itself bound by prior Supreme Court precedent in the form of *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001), held that § 1432(a)(3) does not unconstitutionally discriminate on the basis of sex. However, "where an intervening Supreme Court decision casts doubt on the prior ruling," a panel may reconsider a prior decision even if a case, like *Pierre*, has not been directly overruled. *Doscher v. Sea Port Group Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016) (citation omitted).

At issue in *Nguyen* was § 1409(a)(4) of the INA, which required unwed citizen fathers, but not mothers, to acknowledge parenthood of their foreign-born children in order to transmit citizenship to those children. The Court in *Nguyen* held that because the act of birth inherently legitimates a child as to the child's mother and provides mothers a unique opportunity to develop a social

---

[1] I also concur fully in the majority's determination that second-degree assault under New York Penal Law § 120.05(2) is a crime of violence.

relationship with that child, therefore, to require fathers to take extra steps to prove a biological and social relationship before conferring citizenship was not unconstitutionally discriminatory. *Id.* at 82, 67.

*Pierre*, however, did not simply "adopt[] the Supreme Court's reasoning in *Nguyen*," Majority at 24, but instead extended it in a manner that I suggest conflicts with the fundamental principles outlawing sex discrimination set forth in *Morales-Santana*. In *Morales-Santana*, the Supreme Court invalidated a provision of the INA that imposed different physical-presence requirements on unwed mothers and fathers before they could pass on citizenship to their children. In doing so, the Supreme Court rejected the Government's argument that *Nguyen* controlled the case and held that *Nguyen*'s logic was inapplicable because the provision of the INA at issue (i) was not a "paternal-acknowledgment requirement"; (ii) was not aimed at ensuring "the parent's filial tie to [a] child," but was instead related to an area in which men and women are similarly situated; and (iii) was not "minimal." *Id.* at 1694. As detailed below, the provision of § 1432(a)(3) that Dale here challenges suffers from these same three infirmities.

3

The relevant portion of § 1432(a)(3) provides that a child born outside the United States of alien parents becomes a citizen of the United States upon "the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation." While the latter language may qualify as a paternal-acknowledgment requirement, that is not the language that Dale challenges.

Rather, the gender-based differential Dale challenges is the overall restriction of this route to automatic citizenship to the children of unwed mothers, but not to the children of similarly situated unwed fathers. As *Pierre* itself acknowledged,

> § 1432(a)(3) allow[s] a mother to pass her American citizenship to her child when the father, by failing to legitimate the child, had absented himself from the child's life; but it d[oes] not allow a father . . . to pass his American citizenship to his child where the mother . . . ha[s] similarly abandoned the child.

*Id.* at 57. It is of this discrimination that Dale complains. Thus, as in *Morales-Santana*, the gender classification at issue in this case is not a paternal-acknowledgment requirement, indicating that *Nguyen* does insulate it from equal protection challenge.

Once it becomes clear that the gender classification under attack in this case is not a paternal-acknowledgment requirement, it also becomes clear that the

4

gender classification Dale challenges, like that at issue in *Morales-Santana*, does "not [relate] to the parent's filial tie to [a] child." *Morales-Santana*, 137 S. Ct. at 1694. That is to say that, unlike § 1432(a)(3)'s paternal-acknowledgment requirement, the gender classification Dale challenges here -- the creation of a statutory route to automatic citizenship for the child of an unwed but naturalized mother, but not for the child of a similarly situated unwed father -- is not related to the parent's filial tie to the child in the sense addressed in *Nguyen*.

As explained in *Pierre*, the purpose of § 1432(a)(3)'s creation of an automatic path to citizenship for unwed mothers, but not unwed fathers, was to protect the parental rights of the alien parent by "limiting automatic naturalization only to such narrow situations in which it [i]s reasonable to infer that the alien parent had a lesser interest in the child's citizenship." *Pierre*, 738 F.3d at 53. In other words, the challenged provision is premised, not on the naturalizing parent's filial relationship with a child, but instead on the level of interest of the alien parent. Absent, however, what *Morales-Santana* describes as the invidious stereotype "that unwed fathers care little about, indeed are strangers to, their children," *Morales-Santana*, 137 S. Ct. at 1695, there is no reason to believe that

5

unwed alien fathers are more likely than unwed alien mothers to have a lesser interest in the child's citizenship.

Furthermore, the recognition that Dale is challenging § 1432(a)(3)'s creation of an automatic citizenship exception for unwed mothers alone reveals that the obstacles the statute creates for unwed fathers "cannot fairly be described as 'minimal.'" *Id.* at 1694 (quoting *Nguyen*, 533 U.S. at 70). Contrary to the Government's argument on this appeal, § 1432(a)(3) does not merely "require[] an unwed father to take an affirmative step of formally acknowledging parenthood -- legitimation -- to be on equal footing with an unwed mother." While legitimation may bring an unwed father onto equal footing with an unwed mother in terms of the protection of his parental rights, it does not place him on equal footing with the unwed mother in terms of paths to citizenship for his child. Indeed, there is nothing an unwed father can do, short of marrying and divorcing the biological mother of his child, to receive automatic citizenship for his children under § 1432(a)(3). Requiring marriage and divorce for equal treatment cannot be described as minimal.

It is true, as *Pierre* notes, that there are alternative paths for an unwed father to seek citizenship for his child, reducing the burden § 1432(a)(3) imposes. *Pierre*,

6

738 F.3d at 58. But the existence of alternative means of granting derivative citizenship was only one of two factors the *Nguyen* Court considered as minimizing burdens. There is no reason to believe that the presence of alternatives alone renders the burden on unwed fathers here imposed by the statute "minimal."[2] Thus, §1432(a)(3) imposes more than the minimal requirements imposed by *Nguyen*'s paternal-acknowledgment requirement.

In short, the provision of § 1432(a)(3) that Dale here challenges is totally distinguishable from the paternal-acknowledgement requirement validated in *Nguyen* for the same reasons the Supreme Court distinguished the physical-presence requirement in *Morales-Santana* from the paternal-acknowledgement requirement in *Nguyen*. Conversely, the analysis in *Morales-Santana* completely

---

[2] In holding to the contrary, the majority professes reliance on *Wedderburn v. I.N.S.*, 215 F.3d 795 (7th Cir. 2000), which concluded in part that the availability of an alternative route to citizenship for the children of unwed fathers in former § 1433 foreclosed a constitutional challenge to § 1432(a). As *Pierre* itself noted, however, *Wedderburn* "appear[ed] to apply rational basis review to § 1432(a)." *Pierre*, 738 F.3d at 50. While I thus agree with *Wedderburn* (and the majority) that consideration of alternatives is relevant to our constitutional analysis, *Wedderburn*'s conclusion that such alternatives render § 1432(a) "rationally" related to its purpose, *Wedderburn*, 215 F.3d at 800, in no way compels the conclusion that § 1432(a) is "substantially" related to its purpose, the relevant inquiry here. *Morales-Santana*, 137 S. Ct. at 1690 (2017) (citation omitted).

undercuts *Pierre*'s holding and its purported reliance on *Nguyen*. Reconsideration of *Pierre* is thus warranted here. *Doscher*, 832 F.3d at 378.

Upon such reconsideration, *Morales-Santana* utterly compels finding that the provision of § 1432(a)(3) that Dale here challenges discriminates on the basis of sex. *Morales-Santana* explained that when the Nationality Act of 1940 was passed, "once habitual, but now untenable, assumptions pervaded our Nation's citizenship laws," including that "the [unwed] mother was regarded as the child's natural and sole guardian," 137 S. Ct. at 1690, 1691-92, and that "unwed fathers care little about, indeed are strangers to, their children." *Id.* at 1695. Section 1432(a)(3), passed into law only twelve years after the Nationality Act of 1940, reflects these same stereotypes and is thus similarly untenable.

It remains only to add that Section 1432(a)(3)'s discrimination bears against both men and women. Not only does § 1432(a)(3) posit that the unwed father has less interest in the child than the unwed mother, but also, by conferring "benefits" such as automatic citizenship to women alone, may "creat[e] a self-fulfilling cycle of discrimination that force[s] women to continue to assume the role of primary family caregiver." *Morales-Santana*, 137 S. Ct. at 1693 (alterations in original) (quoting *Nevada Dept. of Human Resources v. Hibbs*, 538 U.S. 721, 736

8

(2003)). Conversely, by denying fathers who have established the paternity of their children an equal opportunity to automatically confer citizenship on their children, § 1432(a)(3) effectively encourages unwed fathers' lack of involvement in their children's lives.

In short, § 1432(a)(3), just like the offending provision in *Morales-Santana*, is premised on the "view that 'unwed fathers [are] invariably less qualified and entitled than mothers to' take responsibility for nonmarital children." *Morales-Santana*, 137 S. Ct. at 1692 (alteration in original) (quoting *Caban v. Mohammed*, 441 U.S. 380, 382 (1979)). But as *Morales-Santana* held, laws relying on the "long-held view that unwed fathers care little about, indeed are strangers to, their children," *id.* at 1695, cannot pass heightened scrutiny because they serve "no important [governmental] interest," *id.* at 1692 (alteration in original) (quoting *Caban*, 441 U.S. at 382). Such stereotypes are not a proper basis for legislation because they "disserve men who," failing to conform to this stereotype, "exercise responsibility for raising their children." *Id.* at 1693. Thus, insofar as the majority holds that § 1432(a)(3) does not discriminate on the basis of sex, I respectfully disagree.

Nonetheless, for different reasons, I concur in the majority's ultimate resolution this case. As the Supreme Court explained in *Morales-Santana*, where an immigration statute extends "special treatment" to unwed mothers that departs from the "general rule" of the statute, the proper remedy is "abrogat[ion]" of the exception in favor of "preservation of the general rule." *Morales-Santana*, 137 S. Ct. at 1700-01. In this case, § 1432(a)(3) represents an exception to the general rule that a naturalizing parent may not automatically and unilaterally confer citizenship on his or her child. As such, the proper remedy would not be to extend § 1432(a)(3)'s benefit to Dale's father, but instead to abrogate the benefit entirely, leaving it to Congress, if it wished, to extend the benefit equally to men and women.[3] I thus concur in the majority's resolution of this case to deny Dale's petition.

---

[3] In fact, Congress has already adopted gender-neutral requirements for automatic citizenship, limiting § 1432(a)(3)'s discriminatory benefit to parents of children (like Dale) born on or before February 27, 1983. *See* Child Citizenship Act of 2000, Pub. L. No. 106-395, § 101(a), 114 Stat. 1631 (8 U.S.C. 1431(a)); *id.* § 104, 114 Stat. 1633.